# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bradford County and PCOMP-The : 
Pennsylvania Counties Workers' : 
Compensation Trust, : 
                  Petitioners : 
                   : 
          v. : No. 926 C.D. 2022
                   : Argued: June 7, 2023
Paul Pasko (Workers' Compensation : 
Appeal Board), : 
                Respondent : 


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE ELLEN CEISLER, Judge
             HONORABLE LORI A. DUMAS, Judge
             HONORABLE STACY WALLACE, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: August 14, 2024


A worker retired and began receiving a pension from his employer. He subsequently returned to work part-time for the same employer, while continuing to receive his previously earned pension. While working part time, he suffered a compensable injury and became eligible for workers' compensation wage loss benefits for nearly a year. We must decide whether his employer may claim a pension offset credit pursuant to Section 204(a), 77 P.S. § 71(a), of the Workers' Compensation Act (Act),[1] against those wage loss benefits, which would prevent the worker from receiving any wage loss benefits. We hold that it may not.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 71(a). The relevant statutory text provides that "the benefits of a pension plan to the extent funded by the employer directly liable **(Footnote continued on next page…)**

## I.    BACKGROUND

### A. *Factual Background*

The Workers' Compensation Judge (WCJ) found the following facts, which are undisputed. Paul Pasko (Claimant) began working for Bradford County (Employer) as a wastewater treatment plant operator in 1993, and he retired after 25 years of service. (WCJ Decision, Finding of Fact (FOF) ¶ 4.) When he retired, Claimant withdrew a lump sum from his employer-funded pension and began receiving a monthly pension benefit of $1,668.23. (*Id.*) After his retirement, Claimant returned to work for Employer on a per diem basis—approximately 16-20 hours per week. (*Id.* ¶ 5.) In June 2020, Claimant injured his back at work. (*Id.* ¶¶ 1, 3.) His average weekly wage at the time of that injury was $277.41 per week, with a disability rate of $249.67. (*Id.* ¶ 2.) Due to the injury, Claimant did not work for nearly a year—from March 3, 2020, through February 18, 2021, at which point he resumed working on a per diem basis in a light-duty position. (*Id.* ¶ 5.) His receipt of his pension benefits was uninterrupted. (*Id.*) Employer does not dispute its liability for Claimant's medical expenses. (WCJ Decision, Conclusions of Law (COL) ¶ 2.) Before the WCJ, Employer asserted it was eligible to take a credit against the wage loss benefits.

### B. *WCJ's Decision*

In answering whether, under Section 204(a), Employer was entitled to a credit against the wage loss benefits it owes Claimant for the pension benefits Claimant received from March 3, 2020, to February 18, 2021, the WCJ reasoned as follows:

---

for the payment of compensation which are received by an employe shall also be credited against the amount of the award" of wage loss benefits. 77 P.S. § 71(a).

Section 204(a) of the . . . Act establishes that an employer is entitled to a credit for the employer[-]funded portion of pension benefits that are received by a [c]laimant during a period of disability. The statute does not differentiate between pension benefits that the [c]laimant began receiving prior to the work injury and pension benefits that the [c]laimant began receiving subsequent to the work injury. In the opinion of this Judge, this lack of such distinction is highly significant. In the section of the Act pertaining to the offset for Social Security benefits, the statute clearly states that an employer is not entitled to credit for Social Security if the employee was receiving Social Security benefits prior to the time of injury. If the legislature had so desired, it could have inserted similar language into the portion of the Act which pertains to the pension offset. The legislature did not do so. This Judge finds that this shows a clear legislative intent that [c]laimants receiving pension benefits prior to their work injury should still be subject to the pension offset.

Claimant's Counsel argues that the language of the Social Security portion of the Act should be applied to this pension question as a matter of equity. This argument is compelling. However, W[orkers' Compensation (WC)] is a statutory scheme, and the plain language of the statute must prevail. Because the legislature did not carve out an exception to the pension offset, this Judge finds that, as a matter of law, [Employer] . . . is entitled to a pension offset.

(*Id.* ¶¶ 4-5.)

### C. The Workers' Compensation Board's Opinion

Claimant appealed to the Workers' Compensation Appeal Board (Board), and the Board reversed. It felt it could not "sanction . . . leaving Claimant with a work-related injury but no disability benefits." (Board Opinion (Op.) at 4.) The Board did not focus on the text of the statute noting that "Section 204(a) does not contain a specific limitation on [an] employer's entitlement to an offset for pension benefits that it funded." (*Id.*) Citing *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.)*, 834 A.2d 524 (Pa. 2003), for the proposition that it was not to assume that a gap in statutory text meant that "by silence" the General Assembly

"intended a result 'at odds with the otherwise logical and consistent slant of the legislation and its humanitarian purpose.'" (*Id.* at 5 (quoting *Hannaberry*, 834 A.2d at 533)), the Board concluded that there is a gap in Section 204(a), which allowed it to turn to "equitable principles." (*Id.*) It pointed out that annuitants frequently wish to supplement their pension by working part time, noting that for Claimant, his per diem employment with Employer "is essentially a **new part-time job**, albeit with the same employer." (*Id.* at 5-6 (emphasis added).) The Board noted that had Claimant chosen to work for a different employer, as opposed to his previous employer, post-retirement, that second employer would not be entitled to a credit. The Board explained that the purpose of Section 204(a) is "to prevent a claimant from receiving double recovery/unjust enrichment and employers from having to pay twice for the claimant's loss of earnings[,]" and the Board observed that this purpose would only be furthered where pension benefits post-dated the compensable injury. (*Id.* at 6 (citing *Murphy v. Workers' Comp. Appeal Bd. (City of Philadelphia)*, 871 A.2d 312, 317 (Pa. Cmwlth. 2005)).) In addition, the Board believed the General Assembly could not have anticipated the increasing number of workers who would retire, take a pension, and reenter the ranks of their former employers on a part-time basis. The Board also believed Claimant raised legitimate policy arguments and concerns regarding the potential disincentives to employees, and incentives to employers that would be incident to allowing employers to claim a credit in these circumstances. Given its conclusion that a gap in the statute existed, the Board concluded by specifically invoking the "spirit of the law and its humanitarian purpose to make [such claimants] financially whole following an injury." (*Id.* at 7.)

4

A timely petition for review to this Court followed.[2]

## II.    PARTIES' ARGUMENTS

### A. *Employer*

Employer argues the Board erred in reversing the WCJ's grant of the offset. Employer asserts the Board's decision is not supported by the plain language of Section 204(a), which the Board acknowledges. Employer maintains the plain language of Section 204(a) mandates that an employer shall be credited against any wage loss benefits for any payments made pursuant to an employer-funded pension, and the General Assembly made its intent apparent through that plain language. According to Employer, Section 204(a) speaks of no exception to the offset for employer-funded pensions, which is unlike the General Assembly's express inclusion of an exception for Social Security old age benefits received before an injury. Employer argues the Board's interpretation essentially amended Section 204(a) to include an exception that the General Assembly did not see fit to include and, therefore, violated the well-settled rules of statutory construction.

Employer further contends the Board's resort to equity to grant relief, due to its inability to "sanction" what would happen if the plain language was followed, was erroneous because the cases the Board relied upon are distinguishable. Employer asserts *Hannaberry* is distinguishable because, contrary to the Board's determination, there is no gap in Section 204(a) that would justify the Board's deviation from the statutory language. Specifically, Employer argues the General

---

[2] In workers' compensation matters, we "will affirm the adjudication below unless we find that an error of law was committed, that constitutional rights were violated, that a practice or procedure of a Commonwealth agency was not followed[,] or that a necessary finding of fact is not supported by substantial evidence of record." *Hannaberry*, 834 A.2d at 527. Here, the sole issue is whether the Board misconstrued and misapplied Section 204(a), and "[s]ince this is a question of law, our review is plenary." *Id.*

5

Assembly necessarily contemplated the scenario where an employee retires, returns to work, and is then injured, because it specifically explained how that scenario affects one form of retirement benefits received by an injured worker (Social Security old age) but did not do so in another (employer-funded pension). Therefore, Employer maintains, no legislative silence exists here. As there is no legally supportable basis to disregard the plain language of Section 204(a), Employer maintains the Board's opinion impermissibly usurped the General Assembly's authority by substituting its own policy determinations for those of the General Assembly.

*B. Claimant*

The silence in Section 204(a) regarding this scenario, Claimant argues, creates ambiguity and a gap in the legislative scheme that allowed the Board to award relief like that granted in *Hannaberry*. Thus, as did the Board, Claimant reasons that there is a gap in the legislative scheme and, therefore, Section 204(a) is ambiguous and uncertain in its silence, such that we can consider the Act's purpose and goals. Claimant adopts the Board's view that Section 204(a)'s language does not distinguish between pension benefits received before and those received after an injury occurs for purposes of an employer offset. According to Claimant, annuitants, who are individuals who retire from full-time work, receive their pensions based upon **that** work, and are subsequently rehired for new part-time work and paid wages for that work by the same employer while continuing to receive their full pension payment, are an emerging class of workers and their situation could not have been known (and addressed) by the General Assembly in 1996, when Section 204(a) was amended.

6

Claimant further argues the purpose of Section 204(a)'s offset provisions, which is to eliminate double payments for the same loss of earnings, is not defeated by the Board's result because he is not being paid twice for the **same** loss of earnings. Rather, he is being paid his pension, which he earned during his full-time work prior to retirement, and wage loss benefits which replace the part-time earnings he was receiving after retirement until his work injury. Given the remedial and humanitarian purposes of the Act, Claimant asserts any ambiguities, inconsistencies, or uncertainties in the Act must be construed in the injured worker's favor. Claimant maintains that, if allowed to stand, the WCJ's decision would mean that annuitants who return to work, and who are injured thereafter, are unable to recoup any of the wage losses resulting from the post-retirement work injury because their pension payments will always be more than their part-time wages. Finally, Claimant argues public policy favors affirming the Board's opinion, as it allows an employer to benefit from an annuitant's expertise while paying only part-time wages and protects an annuitant injured worker from the loss of wages over and above their (already earned) pension benefits.

### C. Employer's Reply Brief

In its reply brief, Employer disputes Claimant's assertion that there is an emerging class of annuitants who were not considered when Section 204(a) was amended. Employer points to the lack of evidence presented to support that factual claim and argues that a retiree returning to work for their employer is not a new phenomenon. Contrary to Claimant's arguments, Employer contends, the potential return to work by a retiree was foreseen when Section 204(a) was amended, as evidenced by the limitation on the offset for Social Security old age benefits that

began before a claimant's work injury. The purpose of Act 57,[3] which amended Section 204(a) to include offsets for retirement benefits, Employer asserts, was to remove roadblocks to employers' entitlement to offsets, thereby reducing the cost of workers' compensation, a purpose met by the WCJ's interpretation and defeated by the Board's interpretation. Employer cites *Kramer v. Workers' Compensation Appeal Board (Rite Aid Corporation)*, 883 A.2d 518, 533-35 (Pa. 2005), as evidence of the Supreme Court rejecting "an analogous argument" to Claimant's. (Employer's Reply Br. at 7.) Employer explains, "[j]ust as with severance benefits in *Kramer*, the employment relationship here was the basis for providing both Claimant's pension payments and workers' compensation benefits, Claimant only experienced one loss of earnings at a time, and the offset prevents Employer from paying duplicate benefits." (*Id.* at 9.) Employer contends there is no authority for the Board to re-write the plain, unambiguous language of Section 204(a), which represents a balance of the competing interests of employers and employees, because it did not like the result.

## III. DISCUSSION

We begin with a review of the history of the Act generally, and Section 204(a) specifically. Such review is consistent with the principle that "we may consider the language of the Act within its historic context, as the Act has undergone significant amendment to its substantive and procedural provisions since its enactment in 1915" and "such analysis is particularly critical when construing legislation, such as the [] Act, which creates a highly structured balancing of competing interests." *Bowman v. Sunoco, Inc.*, 65 A.3d 901, 906 (Pa. 2013) (emphasis added).

---

[3] Act of June 24, 1996, P.L. 350, No. 57.

8

## A. *Legal Background*

### 1. The Act Generally

Prior to the enactment of workers' compensation statutes, to recover lost wages or medical expenses suffered as the result of a work injury, workers had to sue their employers in court. However, many obstacles stood in workers' paths to recovering compensation because they had to prove that the employer's failure to exercise due care was the proximate cause of the injury, and they had to overcome the affirmative defenses of assumption of risk, the fellow-servant rule, and contributory negligence. PRICE V. FISHBACK & SHAWN EVERETT KANTOR, A PRELUDE TO THE WELFARE STATE: THE ORIGINS OF WORKERS' COMPENSATION 30 (2000). Employers were not fully satisfied with the negligence liability system either, as many were "worried about the uncertainties of possible large court awards and dissatisfied that a significant portion of what they paid out for liability insurance never reached the injured worker." *Id.* at 28-29. Therefore, employers and workers forged a compromise.

> [T]o promote certainty in the legal affairs of Pennsylvania's industrial base, while protecting employees and their families from economic devastation arising from work-related injuries, our legislature formulated the Act . . . to assure quick, fair, and certain compensation for employment-related injuries without requiring the complainants to resort to the courts for recovery. . . .
>
> However, in exchange for greatly eased burdens of proof and the abolition of various common-law affirmative defenses, the Act . . . deprives workers of some rights in return for greater certainty in the receipt of benefits. . . .

*Nagle v. TrueBlue, Inc.*, 148 A.3d 946, 951-52 (Pa. Cmwlth. 2016) (internal quotation marks, citations, and brackets omitted). Our Supreme Court has recently reiterated the nature of the compromise in the following way:

9

The exclusivity clause of the [Act, Section 303 of the Act], 77 [] P.S. [§] 481, reflects the historical quid pro quo between an employer and an employee whereby the employer assumes liability without fault for a work-related injury, but is relieved of the possibility of a larger damages verdict in a common[ ]law action. The employee benefits from the expeditious payment of compensation but forgoes recovery of some elements of damages. The comprehensive system of substantive, procedural, and remedial laws comprising the workers' compensation system should be the exclusive forum for redress of injuries in any way related to the work[]place.

*Franczyk v. Home Depot, Inc.*, 292 A.3d 852, 856 (Pa. 2023) (quoting *Ducjai v. Dennis*, 656 A.2d 102, 109 (Pa. 1995)) (some brackets removed). In general, the Act "provides compensation to employees who are injured at work to cover their medical bills and lost wages. Where a work injury prevents an employee from doing his pre-injury job, he is entitled to total disability benefits[4] in the amount of two-thirds of his pre-injury wages." *Stermel v. Workers' Comp. Appeal Bd. (City of Philadelphia)*, 103 A.3d 876, 877 (Pa. Cmwlth. 2014).

### 2. Section 204(a)

In its current form, Section 204(a) specifically provides that

[n]o agreement, composition, or release of damages made before the date of any injury shall be valid or shall bar a claim for damages resulting therefrom; and any such agreement is declared to be against the public policy of this Commonwealth.

The receipt of benefits from any association, society, or fund shall not bar the recovery of damages by action at law, nor the recovery of compensation under article three hereof; and any release executed in consideration of such benefits shall be void:

Provided, however, [t]hat if the employe receives unemployment compensation benefits, such amount or amounts so received shall be

---

[4] In the context of the Act, wage loss and disability benefits are synonymous. *See, e.g.*, *CPV Mfg., Inc. v. Workers' Comp. Appeal Bd. (McGovern)*, 805 A.2d 653, 658 (Pa. Cmwlth. 2002).

credited as against the amount of the award made under the provisions of [S]ections 108[, 77 P.S. § 27.1[5] (occupational diseases)] and 306[, 77 P.S. §[§] 511, 512 (partial and total disability)], except for benefits payable under [S]ection 306(c)[, 77 P.S. § 513 (specific loss benefits)] or 307[, 77 P.S. §[§] 561, 562 (death benefits)].

Fifty per centum of the benefits commonly characterized as "old age" benefits under the Social Security Act (49 Stat. 620, 42 U.S.C. §[§ 301-1397mm]) shall also be credited against the amount of the payments made under [S]ections 108 and 306, except for benefits payable under [S]ection 306(c): Provided, however, [t]hat the Social Security offset shall not apply if old age Social Security benefits were received prior to the compensable injury.

The severance benefits paid by the employer directly liable for the payment of compensation and **the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award** made under [S]ections 108 and 306, except for benefits payable under [S]ection 306(c).

77 P.S. § 71(a) (reformatted for readability) (emphasis added).

The first two sentences have been part of the Act since 1915 and have undergone few alterations since then. The first sentence is "but a statutory extension of the . . . principle" that "[a]t the time the [Act] was passed the settled law of this state was that a contract limiting or releasing damages for future negligence was against public policy." *Anderson v. Carnegie Steel Co.*, 99 A. 215, 217 (Pa. 1916). By contrast, the second sentence changed the common law rule applicable at the time of the Act's passage that permitted an employee to make arrangements in which the employee would, in exchange for benefits from a relief association, release any claim for damages against an employer.[6] In voiding any release signed as part of

---

[5] Added by Section 1 of the Act of October 17, 1972, P.L. 930.

[6] Professor Duff explains the historical context which illuminates the terms "association, society, or fund" in Section 204(a). "One [] venture not widely known to modern students of **(Footnote continued on next page…)**

such agreements in Section 204(a), the General Assembly "declared that it is inexpedient and against public policy to enforce these contracts, so far as they stipulate for a release from damages by the acceptance of benefits . . . ." *Zbirowski v. John T. Lewis & Bros. Co.*, 196 A. 606, 613 (Pa. Super. 1938). Further, and notably, Section 204(a)'s second sentence expressly permits double recovery in certain circumstances because it authorizes recovery of benefits on top of potential recovery from associations, societies, or funds.[7]

Against that backdrop, the General Assembly authorized Section 204(a)'s first employer credit in 1949[8] for unemployment compensation (UC) benefits received by a claimant (UC offset) against occupational disease benefits, further expanding it in 1993[9] to apply against partial and total disability benefits as well. In 1996, the General Assembly further amended Section 204(a) and authorized three additional employer credits.[10] It allowed employers to claim a 50% credit against a claimant's

---

workers' compensation was cooperative insurance [which] began to develop in the late 19th century. Workingmen's cooperative associations (WCAs) initially flourished . . . . [, but b]y 1910[,] WCAs had almost completely disappeared as a significant 'insurer' of employees suffering work-related injuries." Michael C. Duff, *A Hundred Years of Excellence: But is the Past the Prologue? Reflections on the Pennsylvania Workers' Compensation Act*, 87 PA. BAR ASS'N Q. 20, 28 (2016). Professor Duff also details the rise of employer accident funds, participation in which required pre- or post-injury waivers of damages. *Id.* at 29.

[7] In an early case, the Supreme Court decided the question whether children could recover under the Act for the work-related deaths of both their natural father and, later, their stepfather. In answering in the affirmative, the Supreme Court pointed to Section 204, explaining "[w]e find nothing in the [A]ct that prohibits this dual compensation. Moreover, it would seem to be expressly permitted." *Decker v. Mohawk Mining Co.*, 109 A. 275, 275 (Pa. 1920).

[8] Section 1 of the Act of May 14, 1949, P.L. 1379.

[9] Section 4 of the Act of July 2, 1993, P.L. 190.

[10] Section 3 of the Act of June 24, 1996, P.L. 350, No. 57. The 1996 amendments are often referred to as Act 57. Section 204(a)'s credits are among the most "dramatic amendments" to the Act. DAVID B. TORREY & ANDREW E. GREENBERG, WEST'S PENNSYLVANIA PRACTICE, WORKERS' COMPENSATION § 1:68 (4th ed. 2022). "The [1996] amendments were the most dramatic since the 1972/1974 changes to the law which . . . worked, of course, a great liberalization of the law, which **(Footnote continued on next page…)**

disability benefits for Social Security old age benefits received by the claimant (Social Security offset) if the claimant had begun receiving those benefits after the compensable injury, and no credit if the claimant had begun receiving those benefits prior to the compensable injury. Directly at issue in this case is the penultimate sentence, which allows for an employer credit against wage loss benefits to the extent the employer directly liable for the payment of those wage loss benefits has funded a pension or severance.

## B. *Statutory Interpretation Principles*

The text of Section 204(a) and the background of the Act in mind, we turn to the principles of statutory interpretation that aid us in ascertaining the legislative intent behind the statutory language at issue, which is the fundamental goal of statutory interpretation. *Hannaberry*, 834 A.2d at 531. In most cases, we begin and end our interpretation with the **text**—the best indicator of legislative intent—because "[w]hen the words of a statute are clear and free from all ambiguity," we must not disregard the text "under the pretext of pursuing its spirit." Section 1921(b) of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1921(b). In other words, "when the words of a statute have a plain and unambiguous meaning, it is this meaning which is the paramount indicator of legislative intent." *Snyder Bros., Inc. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1058, 1071 (Pa. 2018).

It is also true that "we interpret statutory language not in isolation, but in the context in which it appears." *Commonwealth v. Kingston*, 143 A.3d 917, 922, 924

---

were followed by two decades of expansive interpretation by the Commonwealth and Supreme Courts. The 1996 reforms, like those of 1993, mirrored a national movement aimed at reducing costs and restoring efficiency." *Id.* (footnotes omitted).

(Pa. 2016) (consulting neighboring provisions of the Crimes Code[11] for context and viewing the statute "as a whole" in interpreting unambiguous text). We do not "dissect statutory text and interpret it in a vacuum." *Id.* at 924. The foregoing is an essential recognition of the reality that "[t]o strip a word from its **context** is to strip that word of its **meaning**." *Biden v. Nebraska*, 600 U.S. 477, 511 (Barrett, J., concurring) (emphasis added).[12]

However, the General Assembly recognized in the Statutory Construction Act that it is not always possible to definitively discern legislative intent from statutory text alone and provided that "[w]hen the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering" several extra-textual sources. 1 Pa.C.S. § 1921(c). Among the familiar tools we must consult only after a finding of ambiguity are "occasion and necessity for the statute[,]" "mischief to be remedied[,]" and "consequences of a particular interpretation." 1 Pa.C.S. § 1921(c)(1), (3), and (6). While the Statutory Construction Act uses the term "not explicit" as the gateway to accessing the Section 1921(c) considerations, our Supreme Court has long interpreted that term to be synonymous with ambiguity, which we say exists when two or more reasonable interpretations emerge from

---

[11] 18 Pa.C.S. §§ 101-9546.

[12] Justice Barrett further explained that

> [c]ontext also includes common sense . . . . Case reporters and casebooks brim with illustrations of why **literalism—the antithesis of context-driven interpretation**—falls short. Consider the classic example of a statute imposing criminal penalties on "whoever drew blood in the streets." . . . Read literally, the statute would cover a surgeon accessing a vein of a person in the street. But common sense counsels otherwise . . . because in the context of the criminal code, a reasonable observer would expect the term "drew blood" to describe a violent act.

*Biden*, 600 U.S. at 512 (Barrett, J., concurring) (emphasis added).

statutory text. *Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co.*, 96 A.3d 346, 354-55 (Pa. 2014).

Finally, our Supreme Court recognizes the Act as "remedial legislation . . . subject to a liberal construction to effectuate [its] purpose of benefitting injured workers and their dependents." *Peters v. Workers' Comp. Appeal Bd. (Cintas Corp.)*, 263 A.3d 275, 286 (Pa. 2021) (quoting *Gallie v. Workers' Comp. Appeal Bd. (Fichtel & Sachs Indus.)*, 859 A.2d 1286, 1291-92 (Pa. 2004)). However, that liberal interpretation is not without limits;[13] as our Supreme Court recognized less than a decade after the Act's enactment that

> [c]ourts can give words a liberal interpretation, when construing an act such as the one now before us, in order to carry out its advanced humane intentions, as we have repeatedly done, and shall continue to do, in the administration of this law; but we have no power to depart from the clear meaning of a plainly expressed phrase.

*Maguire v. James Lees & Sons Co.*, 116 A. 679, 680 (Pa. 1922).[14] Relatedly, given that the thrust of the Act is to make claimants economically whole, "[b]orderline interpretations of the [] Act are to be construed in the injured party's favor."

---

[13] The rule of liberal construction of remedial statutes is centuries old. According to the Sutherland treatise, "[t]he remedial rule's modern contours were clear by the late 16th century." NORMAN SINGER & SHAMBIE SINGER, 3 SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 60:1 (8th ed. 2023). Indeed, Blackstone explained that "it is the business of judges so to construe [a remedial] act . . . to suppress the mischief and advance the remedy." *Id.* (quoting 1 BLACKSTONE, COMMENTARIES 8 (Clarendon 1765–69)). However, it is clear that "[a] 'liberal' interpretation in this context means generally that where a statute's language is **ambiguous**" courts liberally construe remedial statutes. *Id.* (emphasis added).

[14] *Maguire* involved the question whether a death had occurred within the course of a worker's employment. Looking to the text, the Supreme Court opined, "were we constructing the statute, instead of construing it, we would write the law so that [the] plaintiff, under the circumstances of this case, could be allowed compensation; but, unfortunately for her, the courts are confined to the words of the law as enacted . . . ." *Maguire*, 116 A. at 680.

*Hannaberry*, 834 A.2d at 528 (citing *Harper & Collins v. Workmen's Comp. Appeal Bd. (Brown)*, 672 A.2d 1319, 1321 (Pa. 1996)).

### C. Analysis

We must first determine whether Section 204(a)'s pension offset provision is ambiguous, and relatedly, whether Claimant's reliance on *Hannaberry* is appropriate.

In *Hannaberry*, the Supreme Court looked to context in finding a different section of the Act ambiguous, thus justifying its departure from its otherwise clear text and the employer's proffered literal reading. *Hannaberry* involved the then-newly amended Section 309(d) of the Act, 77 P.S. § 582(d), also a product of the 1996 amendments, which sets forth the procedure for calculating an average weekly wage for hourly employees.[15] Under the 1996 amendment to Section 309(d), a claimant's average weekly wage under Section 309(d) is calculated by identifying the three highest-earning quarters of the year leading up to the injury and averaging a claimant's weekly wages during those three quarters.[16] Theoretically, that calculation results in an accurate measure of a claimant's wage loss by reflecting

---

[15] The pre-1996 version of Section 309(d) allowed claimants to "cite the highest quarter during the year preceding the injury, even if that quarter reflected aberrationally high wages[.]" *Hannaberry*, 834 A.2d at 526-27. According to the *Hannaberry* Court, "one obvious purpose of the amendment to Section 309(d) was to prevent a claimant from receiving artificially inflated benefits . . . ." *Id.* at 527.

[16] Section 309(d) provides:

> If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

77 P.S. § 582(d).

what the claimant would reasonably expect to earn going forward. The *Hannaberry* claimant worked part time for an employer during high school and transitioned to full-time work for the employer upon graduation, after which he was injured within a few months of the transition. Because the average weekly wage calculation is derived by looking back to the year leading up to the injury, the inclusion of two quarters the claimant worked part-time effectively cut the average weekly wage in half, from approximately $440 to approximately $200, despite the fact the injury happened while the claimant was working full time.[17] The WCJ and the Board determined the part-time wages should not be included in the calculation; this Court reversed.[18]

The Supreme Court granted review and reversed, concluding first that the statutory text was ambiguous. "To understand the ambiguity, one need only view Section 309(d) in **context**[,]" the Supreme Court explained. *Id.* at 531 (emphasis added). The context to which it turned included the other subsections of Section 309, which attempt to "address[] various types of employment relationships commonly found in the working world." *Id.* at 532. It continued that Section 309 "**as a whole** obviously is designed to ensure an **accurate** calculation of wages." *Id.* (second emphasis in original). It observed, however, that

> [t]his case . . . reveals a gap in the legislative scheme and movement toward greater accuracy in the calculation of average weekly wage. . . . Section 309(d) simply does not address the circumstances that is

---

[17] Specifically, "in the three quarterly periods preceding his entry into full-time employment, [the claimant's] average weekly wages were: $57.25 []; $96.87 []; and $110.56 []. In contrast, [his] average weekly wage for the calendar quarter after he assumed full-time status . . . increased more than four-fold, to $473.65." *Hannaberry*, 834 A.2d at 525.

[18] We explained, "this Court is unable to usurp the legislative function by reading into Section 309 of the Act a distinction between part-time and full-time employment that does not exist." *Hannaberry HVAC v. Workers' Comp. Appeal Bd. (Snyder, Jr.)*, 767 A.2d 650, 654 (Pa. Cmwlth. 2001), *rev'd*, *Hannaberry*, 834 A.2d 524.

17

the crux of the dispute *sub judice*, *i.e.*, the situation where the injured worker had progressed . . . from part-time, after-class student employment to full-time work. We do not share the confidence of the employer and the Commonwealth Court that the General Assembly must have intended by that silence to have the actual wages of the injured employee in that circumstance—**unlike all other workers under the overall statutory scheme**—underestimated.

*Id.* at 533 (bold emphasis added). Ultimately, the Supreme Court held that "subsection (d) does not control the calculation in a circumstance, such as this one, where it would lead to a grossly and demonstrably inaccurate measure of a worker's average weekly wage." *Id.* at 534.[19]

Like the *Hannaberry* Court, we conclude that here, there is an ambiguity, and "[t]o understand the ambiguity, one need only view Section [204(a)'s pension offset] in context." *Id.* at 531. Accordingly, we turn to the pension offset's neighboring credits in Section 204(a), each of which is predicated on making claimants whole.

Each credit authorized by Section 204(a) reflects the economic reality that workers typically expect one stream of wages from their employment, so accordingly, workers should only receive benefits (from whatever source or combination of sources) in an amount roughly equal to that single stream of income. Thus, the UC credit accomplishes that goal because if a worker is out of work due to no fault of their own but also receiving wage loss benefits from their employer, that worker is no longer receiving more than the single stream of income they were expecting, but rather two independent replacements for the same loss of wages. *See, e.g.*, *Costa v. Workers' Comp. Appeal Bd. (Carlisle Corp.)*, 958 A.2d 596, 598, 600

---

[19] Justice Eakin, joined by Chief Justice Cappy, dissented, noting "[t]he [l]egislature's failure to anticipate all potential employment situations does not amount to ambiguity[.]" *Hannaberry*, 834 A.2d at 535 (Eakin, J., dissenting). He continued, "[w]hile the result in this case is unfortunate, I am reluctant to carve out exceptions to application of the statutory formula, absent ambiguity in the statute." *Id.*

(Pa. Cmwlth. 2008) (UC benefit offset fact pattern where light-duty work ends and the claimant begins receiving UC benefits, replacing the **same** income stream as wage loss benefits). Further, the Social Security offset also squares, at least roughly, with a claimant's reasonable expectation of wages because if a worker begins receiving Social Security benefits **before** taking a job, that worker reasonably expects to earn wages from their job **in addition to** collecting Social Security benefits. Where a worker is not eligible for Social Security when they take a job, they have **less** of an expectation in receiving **both** Social Security on top of their wages, so the 50% credit makes more sense.[20] The severance offset, too, aligns with a worker's reasonable expectation of wages. When a non-injured worker receives severance, the severance replaces the wages the worker would have otherwise received for a temporary period while that worker seeks new employment. Indeed, our Supreme Court has defined severance benefits as those "payable only when a worker's employment has been **completely and permanently terminated**." *Kelly v. Workers' Comp. Appeal Bd. (U.S. Airways Grp., Inc.)*, 992 A.2d 845, 853 (Pa. 2010) (emphasis added). Therefore, when a claimant receives severance benefits—and wage loss if benefits are continued during the same time—the worker would be receiving more than what they reasonably could have anticipated for that period of

---

[20] The Court in *Caputo v. Workers' Compensation Appeal Board (Commonwealth of Pennsylvania)*, 34 A.3d 908, 917-18 (Pa. Cmwlth. 2012), acknowledged the imperfection inherent in the Social Security offset as it upheld the offset against a constitutional challenge, focusing on the employer's funding of Social Security as forming part of the basis for the justification. "The 50% offset is not a perfect fit because a claimant may have a long work history with multiple employers. In such a case, the last employer would benefit even though it was not the employer that made all the contributions . . . ." *Id.* However, regardless of whether the employer is justified in receiving the Social Security offset, on which the *Caputo* Court was more focused, it is true that when an employee begins a job prior to receiving Social Security, that employee anticipates, at least for a period of time, that they will have only one income stream, and not the wages from the employer on top of Social Security. Notably, too, the Social Security offset **never** operates to **completely** deprive a claimant of recovery of wage loss benefits, as it is capped at 50%.

19

time. And when the severance has been exhausted, presumably the wage loss benefits begin again. *See Kramer*, 883 A.2d at 522 ("As a result of the [severance o]ffset [n]otice, [the c]laimant received no workers' compensation benefits from June 5, 1999[,] through August 9, 1999, after which her total disability benefits resumed.").

Read together, then, the pension offset's neighboring credits all work roughly to ensure that a claimant is made whole by receiving wage loss benefits in an amount no greater than that the claimant could reasonably have expected had the claimant not been injured, relatedly preventing any double payment on the part of an employer. Indeed, the credits reflect a legislative intent to benefit employers by decreasing their liability for payment of wage loss benefits in certain scenarios, but there is no indication that the intent to contain costs for employers should preclude **any** compensation for a claimant's loss of wages due to an injury because in each credit scenario, the claimant is made whole through the receipt of a combination of wage loss benefits and other benefits of an amount roughly approximating what they expect to earn had they been able to keep working. Against that context, we find a literal reading of the pension offset to not meet the stated goals of the provision in this case because it would not eliminate double recovery for Claimant's wage loss, rather, it would eliminate **any** recovery for his current wage loss.

Thus, two reasonable interpretations exist. A literal interpretation, like that espoused by the WCJ and Employer, requires a pension offset where the employer that funded the pension is the same entity that is required to pay wage loss benefits, regardless of whether the pension and wage loss benefits are connected to separate employment relationships. However, a more context-sensitive approach looks to the surrounding credits, which all operate to roughly make claimants whole, and

20

concludes that the literal approach makes little sense in context. That is much like *Hannaberry*, where the Court noted that the neighboring provisions all revealed an attempt toward greater accuracy; a literal reading of Section 309(d) would have created less, and not more, accuracy. Here, similarly, Section 204(a)'s neighboring credits all work to roughly approximate a claimant's reasonable expectation of the wages; a hyper-literal reading of the pension offset would directly contravene that intent. Thus, we find the text ambiguous in light of the broader context of Section 204(a).

Because, read in context, the plain text of the statute does not unambiguously resolve the question, we turn to the parties' arguments relating to "[t]he mischief to be remedied[,]" "[t]he object to be attained[,]" and "[t]he consequences of a particular interpretation." 1 Pa.C.S. § 1921(c)(3), (4), (6). In upholding the severance pay offset against an equal protection challenge, the Supreme Court found the Section 204(a) amendments to advance "[r]easonable workers' compensation cost containment for employers, and the concomitant competitive benefit such cost containment offers for Pennsylvania's businesses[.]" *Kramer*, 883 A.2d at 535. Moreover, we have said that Section 204(a) "serves [the] important policy objective [of] reduc[ing] the cost of the workers' compensation system by eliminating double payment for the **same loss of wages**." *City of Pittsburgh v. Workers' Comp. Appeal Bd. (Wright)*, 90 A.3d 801, 811 (Pa. Cmwlth. 2014) (emphasis added).

Quite simply, the goal of Section 204(a)'s credits is to prevent double recovery on the part of Claimant or double payment on the part of Employer for a single wage loss. *Kramer*, 883 A.2d at 535. We agree with Claimant that the WCJ's approach does not advance either goal, nor does it make Claimant whole. The fact pattern in *Gaughan v. Workers' Compensation Appeal Board (Pennsylvania State*

21

*Police)*, 2 A.3d 785 (Pa. Cmwlth. 2010), illustrates the pension offset operating to eliminate double recovery while still making the claimant whole. There, a claimant began working for his employer in 1981, and in 2005 he was injured and began receiving wage loss benefits. Post-injury, he retired, and the employer claimed a credit in excess of the claimant's wage loss benefits, thereby reducing the claimant's benefits to zero. We upheld the offset. *Id.* at 789. In that scenario, the claimant could only have **reasonably** expected one set of wages from the employer, and **after** that, a pension—not the two stacked. Similarly, the employer could not have reasonably expected it would be required to pay both wages and the pension benefit at the same time to this particular employee. Allowing the pension offset in cases like *Gaughan* reasonably prevents both double recovery and double payment, and it aligns with the reasonable expectations of both claimants and employers with respect to compensation.

That is not what happened here. When Claimant retired, Employer would reasonably have expected it would be required to continue paying Claimant's pension.[21] But it also needed to hire someone to perform additional services for wages—and presumably, if it had not hired Claimant back part time, it would have hired someone else. In other words, it always should have reasonably expected to pay, after Claimant retired, **both** the pension, **and** additional wages on top of the pension for someone to perform the work. We are cognizant that adopting Employer's approach could result in a **windfall** to Employer, which would not be

---

[21] Unless, of course Claimant returned to work and worked more than the hours permitted. Under Section 24 of the County Pension Law, Act of August 31, 1971, P.L. 398, *as amended*, 16 P.S. § 11674, reemployment of a retired county employee terminates that person's right to receive retirement benefits. However, "[i]f a retiree is reemployed on a part-time basis, the retirement allowance shall not cease, but shall be reduced by an amount equal to the amount of compensation received by the employe for service **in excess of 1000 hours per year**." *Id.* (emphasis added).

22

required to pay wage loss benefits to which it acknowledges Claimant is otherwise entitled, based on its payment of an obligation—the payment of the pension benefit—wholly unrelated to Claimant's part-time work with Employer.[22] The reality here is that allowing a credit would not prevent **double** recovery of the wage loss associated **with the work injury**—it would prevent **any recovery of <u>that</u> wage loss**. Again, when Claimant retired, he went back to work expecting to **supplement** his pension, and reasonably expected that he would earn wages on top of the pension. Allowing the credit prevents Claimant from recovering with respect to a wage loss that had nothing to do with his pension. We would hesitate to say that such a potential windfall to Employer, coupled with a result that does not make Claimant whole, amounts to "[**r**]**easonable** workers' compensation cost containment." *Kramer*, 883 A.2d at 535 (emphasis added).

Employer's reliance on *Kramer*'s resolution of an "analogous argument" to argue that the offset does further Section 204(a)'s purpose is misplaced. (Employer's Reply Br. at 7.) There, a claimant was injured at work in 1998, and in 1999, the employer laid the claimant off and made a severance payment pursuant to the parties' collective bargaining agreement. The claimant continued to receive wage loss benefits following her separation from the employer, but the employer took a credit against the wage loss benefits in the amount of the severance. In rejecting the claimant's argument that "workers' compensation benefits and severance payments are made to compensate different losses," the Court explained, "[t]he worker experiences only **one loss of earnings at a time**, even if there is a

---

[22] If Claimant had opted not to return part time and Employer had hired a different worker to perform that same work, and that worker became injured, Employer would always have had to pay Claimant's pension, the new worker's wage loss benefits, and presumably, an additional worker to perform that work in the interim.

prospect of compensation for that loss from multiple sources." *Kramer*, 883 A.2d at 535 (emphasis added). It continued, "[t]he offset does not disadvantage the injured worker *vis*[-]*à*[-]*vis* his uninjured colleagues who also receive severance benefits because those workers do not receive a double benefit[.]" *Id.* The *Kramer* Court explained that "[b]ecause the **employment relationship** is the basis for providing both severance payments and workers' compensation benefits . . . , the employer can avoid paying duplicate benefits for the **same loss of earnings** by using the offset." *Id.* (emphasis added).

Contrary to Employer's view, *Kramer*'s logic **supports Claimant's** position. First, in *Kramer*, there was only **one** loss of earnings, associated with the conclusive ending of the **one** employment relationship of the claimant and her employer. Here, there are **two** earning losses, each connected to **two**, distinct employment relationships. Claimant ended **one** employment relationship by retiring, triggering entitlement to pension benefits already earned, and then entered a **separate** employment relationship with the same employer by becoming a part-time worker; it was the second, part-time employment relationship from which the wage loss benefits flow.

The *Kramer* claimant truly had one loss of earnings, and the severance benefit—undisputedly flowing from the **same** "employment relationship" as the wage loss benefits—compensated for that one loss of earnings until the wage loss benefits resumed. *Kramer*, 883 A.2d at 535. While Claimant here also experienced one **relevant** loss of earnings, that earning loss is entirely associated with his **new** part-time employment with Employer and is wholly unrelated to his pension benefits, which were already earned from his prior employment relationship with Employer. Indeed, the *Kramer* claimant could only have reasonably expected that

**one** set of wages from her employer – which could be replaced **either** by the severance benefits **or** the wage loss benefits, not both.  In contrast, as explained in detail above, Claimant here could reasonably expect **both** his already-earned pension and the wages he was earning for his post-retirement, part-time work.  Again, Employer is simply not "paying duplicate benefits[,]" (Employer's Reply Brief at 9), because those pension benefits are not related to the same loss of wages resulting from Claimant's work injury.

While here, the employer directly liable for the payment of compensation and the employer who funded the pension plan are the same entity in a literal sense, legally, they are distinct.  That is because the employer that funded the pension is Claimant's previous, pre-retirement employer, and his entitlement to receive those pension funds vested when he retired.  The employer directly liable for the payment of compensation is his current, post-retirement, part-time employer.  Thus, in substance, because there are two distinct employment relationships, and the pension benefits flow from one, and the wage loss benefits from another, we cannot say, as in *Kramer,* "the employment relationship[, **singular**,] is the basis for providing both [the pension benefit] and workers' compensation benefits[.]"  *Kramer*, 883 A.2d at 535.  Therefore, when we look to the substance, the employer directly liable for the payment of Claimant's workers' compensation and the employer that funded Claimant's pension are not the same.

The consequences of the parties' competing interpretations also counsel in favor of affirming the Board.  Disallowing the credit in this fact pattern makes Claimant whole by allowing him to receive the pension benefits he reasonably expected to receive on top of his part-time wages.  Employer will not be paying double, but rather, will pay precisely what it expected to—Claimant's pension, plus

wages for someone to do the work it needs done. By contrast, allowing the credit prevents Claimant from being made whole and results in a potential windfall to Employer. As discussed above, only the consequences flowing from Claimant's and the Board's interpretations square with the Act's broader intention of making claimants whole.

In sum, concluding that Section 204(a) is ambiguous, we affirm the Board, given what we know about the mischief to be remedied by Section 204(a) in particular and the purpose of the Act in general. And, certainly, where there are two reasonable interpretations and the case presents a close call, we heed the maxim that "borderline interpretations of the [] Act are to be construed in the injured party's favor." *Hannaberry*, 834 A.2d at 528 (some brackets omitted). We believe this case presents one such borderline interpretation and, in our view, any doubt should inure to the benefit of the injured worker.

Finally, the absurdity doctrine would also prevent us from adopting a literal interpretation of the statute. Recently in *Commonwealth v. Green*, 291 A.3d 317, 330 (Pa. 2023), our Supreme Court applied the formulation of the absurdity doctrine from Justice Wecht's concurrence in *Commonwealth v. Peck*, 242 A.3d 1274, 1285 (Pa. 2020) (Wecht, J., concurring). The absurdity doctrine allows courts to discard a literal interpretation of statutory text only upon satisfaction of two prerequisites. First, "the ostensible absurdity 'must consist of a disposition no reasonable person could intend.'" *Peck*, 242 A.3d at 1287 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 237 (2012)). Second, "there must [] be a non-absurd reading that could be achieved by modifying

26

the enacted text in relatively simple ways." *Id.* (quoting Michael S. Fried, *A Theory of Scrivener's Error*, 52 Rutgers L. Rev. 589, 607 (2000)).[23]

To adopt the literal approach taken by the WCJ and Employer, we would have to believe that the General Assembly intended to single out for disfavored treatment the class of workers who receive a pension and return, post-retirement, to the employer that funded the pension. Second, we would have to believe it intended for that class of workers not to be able to recover wage loss benefits after a compensable injury resulting from their new part-time employment (assuming they are making less or the same as they did before retirement). And finally, we would have to believe the General Assembly intended to single out for special, favorable treatment the class of employers that pay pensions and rehire retirees to work part time, conferring upon them a windfall in the event one of those workers get injured, when they would otherwise not receive a credit had they hired a non-former employee. We believe such an intention is sufficiently absurd to avoid imputing it to the General Assembly. In sum, even if we were to adopt the literal approach, we do not believe a reasonable legislator could have intended this outcome, and the infirmity is easily remedied. Accordingly, the absurdity doctrine would also bar the application of the pension offset credit in scenarios like Claimant's.

---

[23] Although the Supreme Court has broadly explained that certain presumptions codified in Section 1922 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922, only become operative when statutory text is ambiguous, *Commonwealth v. Rosario*, 294 A.3d 338, 354 (Pa. 2023), we note that requiring a threshold showing of ambiguity for the absurdity doctrine to apply would make little sense. As Professor John Manning summarized, "[t]he absurdity doctrine rests on a judicial judgment that a particular statutory outcome, **although prescribed by the text**, would sharply contradict society's 'common sense' of morality, fairness, or some other deeply held value." John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2405-06 (2003) (emphasis added). Indeed, the absurdity doctrine licenses "judges [to] deviate from even the clearest statutory text when a given application would otherwise produce 'absurd' results." *Id.* at 2388.

## IV. CONCLUSION

We hold that Section 204(a)'s pension offset is not available where, as here, the compensable injury occurs within the context of a retiree's subsequent, part-time employment with a former employer. "We think that it would do extreme violence to [Section 204(a)] and the overall Act, to assume that the [General] Assembly . . . intended to single out employees in circumstances such as [Claimant's] for special, punitive treatment . . . ." *Hannaberry*, 834 A.2d at 533. Accordingly, we affirm the Board.

_____
**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bradford County and PCOMP-The     :
Pennsylvania Counties Workers'     :
Compensation Trust,     :
              Petitioners     :
    :
          v.     :    No. 926 C.D. 2022
    :
Paul Pasko (Workers' Compensation     :
Appeal Board),     :
             Respondent     :

## O R D E R

**NOW**, August 14, 2024, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bradford County and PCOMP-The  :
Pennsylvania Counties Workers'  :
Compensation Trust,  :
                 Petitioners  :
  :
          v.  :
  :
Paul Pasko (Workers' Compensation  :
Appeal Board),  :   No. 926 C.D. 2022
           Respondent  :   Argued: June 7, 2023

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE STACY WALLACE, Judge

DISSENTING OPINION
BY JUDGE FIZZANO CANNON            FILED: August 14, 2024

       I am constrained to dissent. The Majority concludes that as written, the pension offset provision of Section 204(a), 77 P.S. § 71(a) of the Workers' Compensation Act (Act),[1] is ambiguous, does not remedy the mischief it was intended to cure, and would lead to inequitable and absurd results. *Bradford Cnty. v. Pasko (Workers' Comp. Appeal Bd.)* \_\_\_ A.3d \_\_\_, \_\_\_ (Pa. Cmwlth., No. 926 C.D. 2022, filed August 14, 2024), slip op. at 21-28. I disagree, as I conclude that the provision is not ambiguous. The Majority's approach improperly rules upon the wisdom of the General Assembly's legislative policy determinations rather than adhering to the role of the judiciary, which is limited to interpreting and applying legislation as plainly written and ensuring that such legislation remains within

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 71(a).

constitutional limits. *Duffey v. Workers' Comp. Appeal Bd. (Trola-dyne, Inc.)*, 152 A.3d 984, 993 n.15, 995 (Pa. 2017) (stating that "our present decision is premised on the plain language of [the Act]" and that "courts should adhere as closely as possible to the existing statutory directives, subject to constitutional limitations").

As part of the cost-containment legislation known as Act 57 of 1996,[2] the General Assembly added provisions concerning when a claimant's wage loss benefits may be reduced in the form of offsets that employers may claim when the claimant also receives Social Security retirement benefits, pensions, and severance payments to Section 204(a) of the Act. The provisions state as follows:

> Fifty per centum of the benefits commonly characterized as "old age" benefits under the Social Security Act . . . shall also be credited against the amount of the payments made . . .: [p]rovided, however, [t]hat the Social Security offset shall not apply if old age Social Security benefits were received prior to the compensable injury. The severance benefits paid by the employer directly liable for the payment of compensation and the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award made[.]

77 P.S. § 71(a).

With regard to Social Security retirement benefits, the General Assembly expressly bars an employer offset if the claimant began receiving such benefits prior to sustaining a compensable work-related injury. *See* 77 P.S. § 71(a) ("[p]rovided, however, [t]hat the Social Security offset shall not apply if old age Social Security benefits were received prior to the compensable injury"). The next sentence, which addresses pension benefits, does not replicate the prior sentence's

---

[2] Section 3 of the Act of June 24, 1996, P.L. 350, No. 57.

language concerning when the claimant begins drawing pension benefits in relation to when the claimant sustains a compensable work-related injury. *See id*. These two provisions not only adjoin each other, but as noted, both were added by the General Assembly to the Act at the same time as part of Act 57.[3]

In this case, Paul Pasko (Claimant) retired in 2018. Reproduced Record (R.R.) at 126a. At that time, his retirement account totaled approximately $307,000. *Id*. Of that amount, Claimant's contributions during his years of working for Bradford County (Employer) totaled approximately $88,000. *Id*. He took that amount out at his retirement as a lump sum. *Id*. This left approximately $219,000, all of which represented Employer's contributions to Claimant's retirement account during his years of service. *Id*. When Claimant returned to work part-time for Employer after his retirement, his average weekly wage was approximately $277 per week, for a weekly benefit rate of approximately $250; he also received a monthly

---

[3] The third offset provision added to Section 204(a) in 1996 concerns when a claimant eligible for workers' compensation benefits is terminated from employment (for reasons not related to the injury) and receives "severance benefits paid by the employer directly liable for the payment of compensation." 77 P.S. § 71(a). This provision is in the same sentence as the pension offset. As written, they are dissimilar from the Social Security offset and similar to each other in that for both, the offset amount is not subject to a 50% cap but is allowed up to the extent the employer pays the claimant's pension or severance benefits, and there is no mention of the timing of receipt of the benefit vis-à-vis the injury.

The Majority notes that the pension and severance offsets operate similarly in that they both serve as replacement wages after the termination of an employment relationship. *See Bradford Cnty.*, ___ A.3d at ___, slip op. at 19-20. The Majority also recognizes that in the absence of a claimant's commencing a new employment relationship by returning to work for the same employer after receipt of a pension or severance, both meet a claimant's reasonable expectations for replacement of the "one loss of earnings" sustained when the prior employment relationship ended. *See id*. at ___, slip op. at 23-24. However, the Majority's ultimate discussion and holding focus on the facts here, where Claimant did return to work for Employer, creating a second employment relationship, and the pension offset is at issue; accordingly, this dissenting opinion does so as well. *See id*. at ___, slip op. at 24-28.

pension benefit, comprised entirely of Employer's contributions to his pension, of approximately $1,668, which reflects a weekly sum of $417. *Bradford Cnty.*, ___ A.3d at ___, slip op. at 2.

Given the foregoing calculations, a straightforward application of Section 204(a) means that when Claimant was injured in 2020 and became eligible for wage loss benefits of approximately $250 per week, Employer was able to take an offset against those benefits up to $417 per week, which effectively negated Claimant's ability to collect any wage loss benefits at all. *Bradford Cnty.*, ___ A.3d at ___, slip op. at 2.

The Majority concludes that, as in *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.)*, 834 A.2d 524 (Pa. 2003), the pension provision of Section 204(a) may be read and applied either literally or "contextually," with differing results, creating an ambiguity that may be resolved with statutory interpretation techniques. *Bradford Cnty.*, ___ A.3d at ___, slip op. at 21. The Majority then determines that the literal reading, which results in Claimant receiving no wage loss benefits for his otherwise compensable injury, fails to cure the mischief of preventing "double recovery on the part of Claimant or double payment on the part of Employer for a single wage loss." *Id*. at ___, slip op. at 21.

Instead, the Majority selects a contextual reading of the pension provision that emphasizes the "reasonable expectations of both claimants and employers with respect to compensation." *Bradford Cnty.*, ___ A.3d at ___, slip op. at 22-23. The Majority also treats Claimant's initial lengthy period of full-time work for Employer and his post-retirement return to part-time work for Employer as two separate employment relationships that render Employer into two legally distinct "employers" for purposes of applying the pension provision of Section 204(a). *Id*.

at \_\_\_, slip op. at 24-25.  This leads to a holding that a pension offset is not available "where, as here, the compensable injury occurs within the context of a retiree's subsequent, part-time employment with a former employer."  *Id*. at \_\_\_, slip op. at 27-28.

In *Hannaberry*, on which the Majority Opinion is modeled, our Supreme Court stated that a plain reading of the relevant provision "simply does not address the circumstance that is the crux of the dispute *sub judice*" and "reveals a gap in the legislative scheme" resulting in ambiguity and the ability to engage in statutory interpretation.  834 A.2d at 533.  However, Section 204(a), as written, expressly addresses the timing and circumstances at issue here: a worker retires, receives a retirement-related benefit, then returns to work and is injured.  If the retirement-related benefit is Social Security retirement, then Section 204(a) plainly states that the employer may not offset the claimant's wage loss benefits.  If the retirement-related benefit is a pension, the next sentence of Section 204(a) states that an offset is available to the extent the pension is "funded by the employer directly liable for the payment of [workers'] compensation" to the claimant, but there is no mention of the timing of receipt of the retirement-related benefit vis-à-vis the injury.

Moreover, Section 204(a) does not reveal a gap in the legislative scheme that may be treated as an indication of ambiguity.  The General Assembly added the two adjoining provisions for Social Security retirement and pensions together in the same legislative action (Act 57 of 1996). Treating Social Security retirement and employer-funded pensions differently was a legislative choice arising out of the General Assembly's balancing of interests, which is inherent in the legislative scheme and which this Court may not overlook.

For example, *Caputo v. Workers' Compensation Appeal Board (Commonwealth of Pennsylvania)*, 34 A.3d 908 (Pa. Cmwlth. 2012), which rejected an equal protection challenge to Section 204(a), explains that the Social Security retirement offset is necessarily imperfect because it cannot account for individual mixtures of employer payments into Social Security and employee tenure and history. *Id.* at 917-18. The time-of-injury employer that can take the offset gains an advantage based on all prior employers' payment into the system on behalf of the claimant. *Id.* Addressing *Caputo*, the Majority notes that in contrast to Section 204(a)'s pension provision, the Social Security retirement provision could never cancel out an employee's workers' compensation benefits entirely because the offset is capped at 50%. *Bradford Cnty.*, ___ A.3d at ___, slip op. at 19 n.17.

However, *Caputo* also speaks to the "infinite array of policy choices" that the General Assembly could have made in 1996. As the Majority notes, the 1996 amendments to the Act represented a rebalancing of interests towards employers after decades of claimant-oriented "great liberalization" and "expansive" interpretations of the Act by our courts. *Bradford Cnty.*, ___ A.3d at ___, slip op. at 12 n.8 (quoting DAVID B. TORREY & ANDREW E. GREENBERG, WEST'S PENNSYLVANIA PRACTICE, WORKERS' COMPENSATION § 1:68 (4th ed. 2021). In *Caputo*, this Court explained:

> The General Assembly chose a 50% offset as a fair approximation of the employer's contribution because of the burden to tailor the offset in each individual case to the actual Social Security tax contributions made by an employer for the employee subject to the offset. Further, former employers will benefit by having the offset apply where they, in turn, have a short history with an employee who is injured and then retires. The goal of the 50% offset is to achieve fairness to the group of all Pennsylvania employers. . . . It is not for this Court to speculate as to

> whether Section 204(a)'s 50% offset is the wisest or best means to accomplish the legitimate legislative goal of cost containment.

*Id*. at 918 (citation omitted).

*Caputo* explains that the time-of-injury employer's contribution to a claimant's overall Social Security "fund" may be minimal compared to that of a prior employer and that the legislature compensated for that potential disparity by limiting the offset to 50%. 34 A.3d at 917-18. The legislature chose to offset pensions differently, but *Caputo*'s point that this was the legislature's prerogative applies equally to pension offsets. As with Social Security retirement, there can be infinite variations in the relative pension contributions of employers and employees, so no legislative choice in how to address the offset would ever be perfect. Here, as noted, Claimant's $307,000 pension account included $88,000 of his own contributions during his tenure with Employer. R.R. at 126a. He took that amount out in a lump sum when he retired in 2018, which left Employer's past contributions of $219,000 to be paid out in a lifetime annuity at $1,668 per month. *Id*. Another similarly situated claimant, even a co-worker, could have a totally different arrangement. In Claimant's case, the amount Employer contributed to his pension almost certainly dwarfs what it paid into Social Security on his behalf, and the availability of a pension offset up to the full extent of Employer's contribution recognizes that distinction.

Given *Caputo*'s recognition of the legislature's aim of rebalancing the Act in 1996 to restore fairness to *all* Pennsylvania employers, this Court may not second-guess the legislature's determination of how best to achieve that goal. Our Supreme Court has stated as follows:

> [I]t is our considered judgment that courts should adhere as closely as possible to the existing statutory directives,

> subject to constitutional limitations, rather than supplementing and/or adjusting these based on judicial policymaking judgments. From our point of view, such restraint is particularly in order given the many compromises and tradeoffs inherent in a workers' compensation liability scheme, among competing interests which each are very important in their own right.

*Duffey*, 152 A.3d at 995; *see also IA Constr. Corp. v. Workers' Comp. Appeal Bd. (Rhodes)*, 139 A.3d 154, 164 n.7 (Pa. 2016) (remarking upon "the superior resources available to the General Assembly in policymaking ventures" and collecting cases distinguishing between "the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations").

In speaking of "constitutional limitations," *Duffey* and other similar cases recognize the appropriate role of the judiciary. For example, a claimant similarly situated to Claimant could challenge the pension provision of Section 204(a), as applied by an employer to reduce or negate the claimant's wage loss benefits, on the basis that it violates the Pennsylvania Constitution's Remedies Clause, which states:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art. I, § 11.

The Remedies Clause provides "an independent guarantee of legal remedies for private wrongs by one person against another, through the state's judicial system." *Konidaris v. Portnoff L. Assocs., Ltd.*, 953 A.2d 1231, 1240 (Pa. 2008). The claimant would have to show that application of the pension provision

of Section 204(a) extinguished a vested right to recovery that accrued when he or she sustained a compensable work-related injury. *See Konidaris*, 953 A.2d at 1238. As with any constitutional challenge, the claimant's burden would be heavy, "for we presume legislation to be constitutional absent a demonstration that the statute 'clearly, palpably, and plainly' violates the Constitution." *Id*. at 1239. However, consideration of the question would not force this Court to abandon its role and assume that of the General Assembly in order to address an alleged wrong.

I am mindful that equitable considerations have a place in workers' compensation and that the Act is remedial legislation that must be liberally construed to effectuate its humanitarian objective of benefiting the worker. *See Hannaberry*, 834 A.2d at 528. Moreover, Claimant presents a highly sympathetic claim in this matter. However, because Section 204(a) is unambiguous, the Majority's approach is improper, and I am constrained to dissent.

_____
CHRISTINE FIZZANO CANNON, Judge